UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAMELA L. WYATT,
             Plaintiff,                CIVIL ACTION NO. 12-11406

      v.                       DISTRICT JUDGE JOHN CORBETT O'MEARA

                             MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,
             Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 13, 19)

Plaintiff Pamela L. Wyatt challenges the Commissioner of Social Security's ("the Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 13, 19).[1] Plaintiff also filed a response (Dkt. No. 20). Judge John Corbett O'Meara referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 5).

## I.    RECOMMENDATION

Because the Administrative Law Judge's ("ALJ") RFC determination is not supported by substantial evidence, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, the Commissioner's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner.

## II.    DISCUSSION

### A.    *Framework for Disability Determinations*

Under the Social Security Act, (the "Act") Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin*

---

[1]Plaintiff's brief is a separate document (Dkt. No. 14).

*v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.    *Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses" (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See*

-3-

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can

consider all the evidence without directly addressing in his written decision every piece of

evidence submitted by a party" (internal quotation marks omitted)). Further, this Court does

"not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*,

499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing

court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.    *Administrative Proceedings*

Plaintiff applied for disability and disability insurance benefits on November 21, 2007,

alleging she became disabled on June 19, 2007 (Tr. 34). After the Commissioner initially denied

Plaintiff's application, she appeared with counsel for a video hearing before ALJ Theodore W.

Grippo, who considered the case *de novo*. In a written decision, the ALJ found Plaintiff was not

disabled (Tr. 34-49). Plaintiff requested an Appeals Council review (Tr. 11). On January 24,

2012, the ALJ's findings became the Commissioner's final administrative decision when the

Appeals Council declined further review (Tr. 1-3).

### B.    *ALJ Findings*

Plaintiff graduated from high school and has past relevant work as an equipment

sterilizer (Tr. 15, 47). The ALJ applied the five-step disability analysis to Plaintiff's claim and

found at step one that she had not engaged in substantial gainful activity since her disability

onset date in June of 2007 (Tr. 36).

At step two, the ALJ found that Plaintiff had the following "severe" impairments:

osteoarthritis, fibromyalgia,[2] narcolepsy, and an affective disorder (Tr. 36). The ALJ found that

---

[2]Fibromyalgia is pain and stiffness in the muscles and joints. *See Dorland's Illustrated Medical Dictionary*, 711 (31st Ed. 2007).

Plaintiff's hypertension, carpal tunnel syndrome, bladder incontinence, status post left cavovarus foot reconstruction,[3] trouble with her right foot, and pre-cancerous Tamoxifen treatment were non-severe impairments (Tr. 36-38).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 38).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform "light work[4] . . . except [Plaintiff] needs to avoid hazards (machinery, heights, etc.) and is able to occasionally climb, balance, stoop, kneel, crouch, and crawl. In addition, [Plaintiff] is limited to simple work tasks with one or two step instructions" (Tr. 40).

At step four, the ALJ found that Plaintiff could not perform her past relevant work as an equipment sterilizer (Tr. 47).

At step five, the ALJ found Plaintiff was not disabled, because there are a significant number of jobs available in the national economy that she could perform (Tr. 48).

### C.    *Administrative Record*

#### 1.    **Plaintiff's Hearing Testimony and Statements**

---

[3]"A cavovarus foot deformity usually appears during childhood. The arch is very high and the heel slants inward." *See* http://www.feetmd.com/foot-ankle-conditions/cavus-high-arch-feet (last visited July 18, 2013).

[4]"[T]he full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10. Light work also involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" 20 C.F.R. § 404.1567(b).

Plaintiff testified that she did not return to work after she had reconstructive surgery on her left ankle in June of 2007: "the surgery turned out to be much more than I had anticipated and my bones didn't heal the way they were expected and my surgeon, after a year's time would not clear me to return to [work]" (Tr. 15-16). According to Plaintiff, she also has chronic fatigue; trouble with her right foot; clumsiness; sudden motor weakness; narcolepsy with excessive daytime sleepiness; bladder incontinence; lower back pain; trouble concentrating; "major" memory loss; confusion; depression and crying spells on a regular basis; arthritis throughout her entire body and joints; and, fibromyalgia (with at least one flare up a month that can last up to a week) (Tr. 16-22). In addition, Plaintiff testified that she was diagnosed with pre-cancer in her breast and has to take Tomoxofin as a preventative maintenance for five years and be monitored every six months (Tr. 19). When Plaintiff has a fibromyalgia flare up, she feels like she is "in a cloud," and the pain makes her feels like she has been "hit by a train" (Tr. 21). Plaintiff said she needs to lie down during the day, and stays in bed all day for as many as three days a week (Tr. 21-22).

Plaintiff testified that she can stand for 10 minutes, but "every day is a struggle"; she can walk four houses in her subdivision; sit for "a few minutes"; and lift a gallon of milk (Tr. 20). Despite her limitations, Plaintiff reported that she can do laundry, vacuum, and help her husband cook dinner (Tr. 23). When asked if she experienced side effects from her medication, Plaintiff said: "[n]ot that I notice. I mean, you know, again, the fatigue and you know, depression and that kind of thing. So, I'm not sure that it's specifically from – there's nothing specific that I've noticed from any specific medication" (Tr. 18).

### 2.    Relevant Medical Evidence

#### a.    *Plaintiff's Ankle, Foot, and Leg Pain*

A bone scan performed at the request of Plaintiff's treating physician – Manveen K. Saluja, M.D. – on September 17, 2004 was abnormal: it showed evidence of polyarthritis in Plaintiff's shoulders, elbows, patella, feet and possibly hip joints (Tr. 232).

On October 31, 2005, Plaintiff reported to C. Christopher Stroud, M.D., P.C., that she had chronic pain in her left foot with burning (Tr. 342).

X-rays of Plaintiff's ankles on May 1, 2007 found mild osteoarthritic degenerative changes of the tibiotalar (ankle) joint bilaterally, some irregularity of the distal tip of the medial malleolus[5] bilaterally, and some nonspecific soft tissue swelling bilaterally.  There was no acute osseous[6] or articular abnormality and no osteocartilaginous[7] defect (Tr. 299).

On May 23, 2007, Plaintiff reported to a physical therapist at William Beaumont Hospital ("Beaumont") that she had pain in both legs, and she felt like she had been electrocuted (Tr. 254).

Plaintiff was admitted to Beaumont from June 19, 2007 until June 22, 2007 for left cavavarus foot deformity, left gastrocnemius contracture,[8] and left ankle instability (Tr. 307).

---

[5]The medial malleolus is located at the inner aspect of the ankle.  *See* http://www.physioadvisor.com.au/13162150/medial-malleolus-fracture-physioadvisor.htm (last visited July 19, 2013).

[6]Osseous means "of the nature or quality of bone; bony."  *Dorland's Illustrated Medical Dictionary*, 1364 (31st Ed. 2007).

[7]Osteocartilaginous means "pertaining to or composed of bone and cartilage."  *Dorland's Illustrated Medical Dictionary*, 1366 (31st Ed. 2007).

[8]"Isolated gastrocnemius contracture (IGC) is characterized by limited ankle dorsiflexion with full knee extension.  IGC has been associated with painful foot pathologies that, left untreated or treated unsuccessfully, can severely reduce function and affect quality of life."  *See* http://udini.proquest.com/view/gastrocnemius-recession-a-treatment-pquid:1891590541/ (last visited July 18, 2013).

On June 19, 2007, Dr. Stroud performed a Dwyer calcaneal osteotomy,[9] Strayer gastrocnemius release,[10] first metatarsal dorsiflexion osteotomy,[11] plantar fascial release,[12] and tibial valgus osteotomy[13] (Tr. 308). The surgical procedures included placement of screws and a plate (Tr. 310).

On June 29, 2007, Dr. Stroud noted that Plaintiff had "quite a bit" of swelling. She was placed in a short leg cast and instructed to avoid weight bearing (Tr. 329).

On July 30, 2007, Dr. Stroud noted that Plaintiff was doing "reasonably well," and her foot was in reasonable alignment. Plaintiff was instructed to wear her boot brace at all times,

---

[9]"The Dwyer calcaneal osteotomy is a useful adjunctive procedure to address the heel varus component of the cavus foot deformity[.]" *See* http://www.ncbi.nlm.nih.gov/pubmed/22064124 (last visited July 18, 2013).

[10]"The Strayer procedure (gastrocnemius recession) is a treatment option for patients with clinically relevant gastrocnemius equinus contracture." *See* http://www.ncbi.nlm.nih.gov/pubmed/15132933 (last visited July 18, 2013).

[11]"This type of procedure is indicated for patients with a high-arched foot, which can lead to a variety of critical problems, including recurring ankle sprains, ankle instability, peroneal tendonitis, 5th metatarsal stress fractures, and sesamoiditis." *See* http://www.footeducation.com/dorsiflexing-1st-metatarsal-osteotomy (last visited July 18, 2013).

[12]"Plantar fascia release surgery involves cutting part of the plantar fascia ligament [a ligament attached to the heel bone] to release tension and relieve inflammation of the ligament[.]" *See* http://www.webmd.com/a-to-z-guides/plantar-fascia-release (last visited July 18, 2013).

[13]"Knee osteotomy is surgery that removes a part of the bone of the joint of either the bottom of the femur (upper leg bone) or the top of the tibia (lower leg bone) to increase the stability of the knee. Osteotomy redistributes the weight-bearing force on the knee by cutting a wedge of bone away to reposition the knee. The angle of deformity in the knee dictates whether the surgery is to correct a knee that angles inward, known as a varus procedure, or one that angles outward, called a valgus procedure. Varus osteotomy involves the medial (inner) section of the knee at the top of the tibia. Valgus osteotomy involves the lateral (outer) compartment of the knee by shaping the bottom of the femur." *See* http://www.lifebridgehealth.org/RIAO/Osteotomy.aspx (last visited July 18, 2013).

except when she bathed, showered, and slept.  Plaintiff was toe-touch weight bearing with crutches for two weeks, and then 50% weight bearing during weeks two to four (Tr. 329).

On August 27, 2007, Plaintiff reported that she could not put weight on her ankle.  On examination, Plaintiff had moderate swelling, but her ankle and foot were in excellent clinical position; there was no tenderness; and, she had excellent up and down movement.  Dr. Stroud recommended that Plaintiff work on her range of motion and not return to work (Tr. 331).

On September 24, 2007, Plaintiff reported "a lot of pain" in her foot and ankle on a daily basis and severe muscle spasms and cramps at the end of every day.  Plaintiff walked with a limp; she had not worn her boot brace for two weeks.  Radiographs showed broken hardware and a healed first metatarsal osteotomy and calcaneal osteotomy, but incomplete healing of the distal tibial osteotomy.  On examination, Dr. Shroud noted mild swelling, but excellent motion.  He recommended that Plaintiff wear her boot brace and compression stockings; and, remain off work (Tr. 332).

On October 10, 2007, Plaintiff reported that her ankle was "popping and cracking" (Tr. 333).

On October 29, 2007, Plaintiff had a CT scan of her left ankle.  Dr. Tarun Gupta, M.D. found bony bridging with persistent lucency through the distal tibial osteotomy; and, thickening

of the distal aspect of the posterior tibial tendon,[14] consistent with either tendinosis[15] or a partial

tear (Tr. 318).

On October 22, 2007, Plaintiff wore her boot brace, but reported that she could walk

without it.  Plaintiff also reported that her pain was tolerable (although, she had swelling toward

the end of the day), and her range of motion improved.  On examination, Dr. Stroud found

chronic swelling, tenderness at the distal tibial incision and ankle joint, and bridging callus

across the osteotomy site.  Dr. Stroud concluded that Plaintiff improved, and the osteotomy site

was healing.  He again recommended that Plaintiff wear compression stockings and her boot

brace on a regular basis (Tr. 328).

On November 19, 2007, Plaintiff complained of swelling and pain on the top of her foot.

According to Plaintiff, "all her joints bother[ed] her even her [right] side, shoulders and back."

Plaintiff reported that "[s]ometimes her foot [was] good and sometimes it [was] bad."  Her pain

ranged from 2/10 at best, 5/10 on average, and 10/10 at its worst.  Plaintiff walked with a limp;

she was not wearing her boot brace.  Plaintiff reported that she could stand for 15-30 minutes,

and walk about 3/4 of a block.  On examination, Dr. Stroud found much less swelling, excellent

alignment of the lower extremity when Plaintiff stood up, no tenderness, excellent active motion,

---

[14]"The *posterior tibial tendon* runs behind the inside bump on the ankle (the *medial malleolus*), across the instep, and into the bottom of the foot.  The tendon is important in supporting the arch of the foot and helps turn the foot inward during walking."  *See* http://www.methodistorthopedics.com/posterior-tibial-tendon-problems (last visited July 19, 2013) (italics in original).

[15]"Tendinosis is a degeneration of the tendon's collagen in response to chronic overuse; when overuse is continued without giving the tendon time to heal and rest, such as with repetitive strain injury, tendinosis results.  Even tiny movements, such as clicking a mouse, can cause tendinosis, when done repeatedly."  *See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3312643/ (last visited July 19, 2013).

and the osteotomy was healing.  There was osteolysis or wear in the medial talar dome.[16]  He recommended that Plaintiff remain off work, wear a lace up ankle brace and a soft sole tennis-type shoe, and begin physical therapy (Tr. 327).

Plaintiff began physical therapy on November 27, 2007.  She reported intermittent lateral ankle pain that worsened in the evening and increased with weight bearing activities, including walking (Tr. 472, 476).  Plaintiff also reported that "[her] back legs and hips [had] chronic pain as well as [her] knees at various times" (Tr. 476).  Plaintiff could balance three seconds on the left side and 20 seconds on the right side.  She walked with an antalgic gait;[17] had moderate swelling and tenderness; and, moderate pain and difficulty when she stood for more than 30 minutes, walked, and went up and down stairs (Tr. 472).  According to Plaintiff, she sometimes used a cane (Tr. 477).

On November 29, 2007, Plaintiff complained of severe weakness in her ankle and moderate instability in her ankle with activity (Tr. 470).

On December 6, 2007, Plaintiff reported "a lot" of swelling in her ankle, and soreness during therapy sessions.  Plaintiff stated that her ankle felt better the day after the therapy sessions (Tr. 466).

On December 13, 2007, Plaintiff reported that her pain decreased in intensity, and on December 20, 2007, she reported that her ankle was not as sore (Tr. 462, 464).

---

[16]The medial talar dome is the "inside and top part of the lower bone of the ankle."  *See* http://www.footeducation.com/osteochondral-lesions-of-talus-olt-talar-ocd-talar-ocl (last visited July 19, 2013).

[17]An antalgic gait is "[a] limp in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side."  *See* http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited July 19, 2013).

On December 27, 2007, Plaintiff's pain and swelling increased in her left ankle; she did a lot of standing over the holiday (Tr. 460).

On January 7, 2008, Plaintiff reported that the swelling in her left foot had decreased during the past week; she had stayed off her feet (Tr. 457).

On January 10, 2008, Plaintiff was discharged from physical therapy; she reached her long term goals.  Her left ankle range of motion improved to within normal limits in all planes, and her ankle strength improved to 4/5.  In addition, Plaintiff demonstrated proper gait pattern in her left lower extremity; she could balance for five seconds on left side; and, she had minimal pain and difficulty with going up and down stairs and prolonged walking and standing (more than one hour).  Plaintiff reported that physical therapy improved her strength and mobility 75% (Tr. 455-456).

On January 21, 2008, Plaintiff reported that her range of motion and strength improved over the last six weeks, but she had occasional burning in her heel and across the top of her ankle.  Plaintiff walked with a limp although she wore her boot brace.  On examination, Dr. Stroud noted that Plaintiff had moderate chronic swelling, overall good clinical position of her foot, an antalgic gait, excellent range of motion and strength, and tenderness about the anterolateral aspect of the ankle joint.  Dr. Stroud concluded that Plaintiff had status-post cavovarus foot reconstruction and improving left ankle and foot pain (Tr. 567).

On May 8, 2008 – approximately 11 months after she had surgery on her left ankle – Plaintiff saw Dr. Stroud for a follow up.  Plaintiff reported that she felt better than before the surgery; any symptoms she had were activity related.  According to Plaintiff, her pain was 1/10 at its best, 2/10 on average, and 10/10 at its worst.  On examination, Dr. Stroud found mild swelling, but Plaintiff had excellent range of motion and strength.  Plaintiff had a mildly antalgic gait.  Dr. Stroud diagnosed Plaintiff with status-post cavovarus foot reconstruction.  He noted

that Plaintiff was "doing rather well," but she still complained of pain in multiple other joints; Dr. Stroud supported her disability application. (Tr. 566).

On April 16, 2009, Plaintiff had good range of motion in her foot, ankle, and toes. She only complained of calluses on her heel. Dr. Stroud found Plaintiff had a possible fungal infection or athletes foot; he did not document any other issues, problems, symptoms, limitations, or pain associated with Plaintiff's June 2007 foot surgery (Tr. 565).

On August 24, 2009, Plaintiff reported mild pain in her left ankle (Tr. 667).

### b.      Plaintiff's Back Pain and Carpal Tunnel Syndrome

On May 9, 2007, Plaintiff saw John T. Maltese Jr., M.D., at LMT Rehabilitation Associates, P.C. Plaintiff reported lower back pain with radicular symptoms going down her legs. On examination, Dr. Maltese found some paraspinal muscle tenderness in Plaintiff's lower back and noted that extending her back caused Plaintiff discomfort. Dr. Maltese's impressions included: (1) intermittent numbness and tingling in Plaintiff's legs with radicular symptoms at times (possible neuropathy[18] verus radiculopathy[19]); (2) history of fibromyalgia; and, (3) history of carpal tunnel syndrome with left carpal tunnel release surgery done previously[20] and increasing right-sided symptoms (Tr. 274-275).

An MRI of Plaintiff's lumbar spine dated May 18, 2007 showed mild focal bulging of the intervertebral disc at L5-S1 posteriorly on the right side (Tr. 291).

---

[18]Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system[.]" *Dorland's Illustrated Medical Dictionary*, 1287 (31st Ed. 2007).

[19]Radiculopathy is a disease of the nerve roots. *Dorland's Illustrated Medical Dictionary*, 1595 (31st Ed. 2007).

[20]Plaintiff had left carpal tunnel release surgery on October 13, 2003 (Tr. 558).

On May 23, 2007, electromyography ("EMG") testing showed mild right carpal tunnel syndrome and left L5 radiculopathy.  Plaintiff was given a prescription for a splint (Tr. 279).

A Physical Therapy Status Report dated May 31, 2007 included a notation that Plaintiff was at 40% disability based on her answers to the Oswestry Low Back Pain Questionnaire[21] (Tr. 258).

Another Physical Therapy Status Report dated June 18, 2007 included a notation that Plaintiff's lower back pain was 2/10, which she reported was a 25% improvement.  It was noted that Plaintiff could not return to work for three to four months (due to her ankle surgery) (Tr. 245).

On October 14, 2008, Plaintiff complained of "severe pain and burning and numbness [in her] right hand."  Specifically, Plaintiff had frequent numbness and tingling in her middle, ring, and small fingers that caused nocturnal awakening; her daily activities made her symptoms worse.  On examination, Mark P. Koniuch, M.D., P.C., found numbness in the median nerve distribution of the right hand.  He diagnosed Plaintiff with right carpal tunnel syndrome (Tr. 558-559).

An EMG report of Plaintiff's right hand performed on October 20, 2008 showed her carpal tunnel syndrome had progressed since the last EMG test on May 23, 2007 (Tr. 552).

On October 28, 2008, Plaintiff reported that she wanted to proceed with the right carpal tunnel release surgery, because her symptoms were becoming worse (Tr. 557).

---

[21]The Oswestry Low Back Pain Questionnaire is "designed to give [the] therapist information as to how [a client's] back pain has affected [her] ability to manage in every day life."  *See* http://d-scholarship.pitt.edu/9230/10/ChildsI.pdf (last visited July 19, 2013).

On November 17, 2008, Mark P. Koniuch, M.D., performed the right carpal tunnel release surgery. It was noted that Plaintiff had a "longstanding history of chronic and recurrent right carpal tunnel syndrome" (Tr. 613).

On November 25, 2008, Plaintiff had minimal swelling, full motion of her fingers, and good return of sensation (Tr. 556).

On December 2, 2008, Dr. Koniuch instructed Plaintiff to "take it easy;" avoid forceful gripping or squeezing and thumb abduction for at least three days; and, wear her boot brace every night for the next two weeks and during the day for the next five days (Tr. 555).

On December 16, 2008, Plaintiff's incision from her right carpal tunnel release surgery was healed, and she only had mild swelling and residual induration. Plaintiff did not have any tenderness or sensitivity; and, she had full motion of her fingers, normal thenar muscle strength, and very good improvement in sensation (Tr. 554).

An MRI of Plaintiff's lumbar spine performed on July 29, 2009 revealed mild to moderate size protrusion at L5-S1 with some slight eccentricity to the right of the midline. When compared to the prior MRI, the prominence at L5-S1 appeared slightly increased in the interval. Facet arthropathy[22] was also seen at the L4-L5 and L5-S1 levels (Tr. 654). An MRI of Plaintiff's sacroiliac joints[23] revealed mild degenerative change at the inferior thirds of both sacroiliac joints, but no evidence of bone marrow edema[24] or sacroiliitis[25] (Tr. 649).

---

[22]"[F]acet arthropathy is degenerative arthritis affecting the facet joints in the spine." *See* http://arthritis.about.com/od/spine/p/facet_joints.htm (last visited July 19, 2013).

[23]"The sacroiliac joint is in the low back where the spine meets the pelvis." *See* http://medicine.med.nyu.edu/conditions-we-treat/conditions/sacroiliac-joint-pain (last visited July 19, 2013).

[24]Edema is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues. It may be localized (such as from venous obstruction, lymphatic obstruction, or increased vascular permeability) or systemic (such

A bone scan on November 3, 2009 revealed no evidence of active inflammatory arthropathy; and, Plaintiff's arthritis areas appeared relatively stable, including the shoulders, sternoclavicular joints[26] and patella.  Plaintiff had mild arthritis in the left L5-S1 facet; and, probable mild strain or mild bony contusion in the fifth tarsometatarsal joint (Tr. 689).  A bone mineral density analysis revealed that the density in Plaintiff's lumbar spine was within normal limits, and she had a normal fracture risk based on the mean femoral neck density and the total hip mean density (Tr. 691).  Plaintiff had loss of lordosis in her cervical spine[27] and mild degenerative changes in her lower cervical spine; she did not have any acute fractures or subluxation,[28] the vertebral heights were maintained, the disc spaces were preserved, and the prevertebral soft tissues were unremarkable (Tr. 693).

On May 4, 2009, Plaintiff had mild narrowing of the L5-S1 disc space and minimal degenerative changes of the sacroiliac joints without acute fracture or subluxation (Tr. 694).

_____

as from heart failure or renal disease)." *Dorland's Illustrated Medical Dictionary*, 600 (31st Ed. 2007).

[25]"Sacroiliitis is an inflammation of one or both of [the] sacroiliac joints[.]" *See* http://www.mayoclinic.com/health/sacroiliitis/DS00726 (last visited July 19, 2013).

[26]"The sternoclavicular (SC) joint is important because it helps support the shoulder.  The SC joint links the bones of the arms and shoulder to the vertical skeleton." *See* http://www.eorthopod.com/content/sternoclavicular-joint-problems (last visited July 19, 2013).

[27]Cervical lordosis is "the dorsally concave curvature of the cervical spinal column when seen from the side." *Dorland's Illustrated Medical Dictionary*, 1090 (31st Ed. 2007).

[28]"[A] subluxation . . . is when one or more of the bones of [the] spine (vertebrae) move out of position and create pressure on, or irritate spinal nerves." *See* http://www.echiropractic.net/what_is_a_subluxation.htm (last visited July 19, 2013).

### c.       *Plaintiff's Sleep Problems*

Treatment records from Lifetime Medical Associates, P.C. show that Plaintiff complained of fatigue on March 2, 2006 and, on May 30, 2007, Plaintiff reported that she was "[t]ired all the time" (Tr. 196-197).

On December 20, 2006, Plaintiff reported to the Sleep Disorders Institute ("the Institute") that she had excessive sleepiness, fatigue, tiredness, lack of energy, lack of attention, and memory difficulty (Tr. 420).  The Institute noted that Plaintiff "was evaluated with a comprehensive history and examination on December 20, 2006, for apneic episodes[29] in sleep for [eight] years" (Tr. 434).  Plaintiff reported that her symptoms interfered with her daily routine, and she had severe difficulty with memory and concentration (Tr. 434).  R. Bart Sangal, M.D. diagnosed Plaintiff with obstructive sleep apnea[30] (Tr. 434).

On January 15, 2008, Timothy Macon, D.O., F.C.C.P., D.A.B.S.M., found Plaintiff's signs and symptoms were suggestive of severe obstructive sleep apnea (Tr. 538).

On January 21, 2008, Plaintiff reported that her chronic fatigue and pain made her feel like she was "hit by a train."  She had sleep disturbance and fatigue (Tr. 491-492).

On January 23, 2008 and February 4, 2008, Dr. Macon found no evidence of a sleep-related breathing disorder.  Dr. Macon also found that Plaintiff had no periodic limb movements during sleep (Tr. 535, 537).

---

[29]"Apneic episodes cause a patient's blood oxygen to drop as the carbon dioxide found in the blood rises.  The heart rate increases, and the stops and starts in breathing disrupt sleep.  Deep sleep is interrupted and light sleep ensues, or the patient wakes up in order to breathe and then must begin the sleep process again."  *See* http://fallingasleep.net/sleep-disorders/apnea (last visited July 18, 2013).

[30]"Obstructive sleep apnea is a potentially serious sleep disorder in which breathing repeatedly stops and starts during sleep."  *See* http://www.mayoclinic.com/health/obstructive-sleep-apnea/DS00968 (last visited July 19, 2013).

-17-

On March 30, 2009, Plaintiff saw A. Robert Spitzer, M.D., for a consultation regarding her severe pain and fatigue. Plaintiff reported that she had pain, tenderness, and fatigue everywhere; sometimes she felt like she was "hit by a train." Specifically, Plaintiff reported a dull, aching, nagging, annoying pain in her back that sometimes prohibited her from standing up straight, and limited her function and ability to perform activities. Plaintiff also reported that she sometimes had knee pain (her knees bothered her more on the right side than on the left side), her legs always felt weak, and sometimes her legs "gave out." Plaintiff also stated that she had difficulty picking up objects; she felt like her arms moved in slow motion; she had numbness from her hands to her elbows; no strength; weakness in her arms; and, she could not open jars. Plaintiff reported that she did not sleep well or regularly: some nights she had a deep sleep and other nights, she could not sleep at all. Plaintiff never felt refreshed in the morning. On examination, Dr. Spitzer found that Plaintiff's coordination testing was normal in the upper and lower extremities; her deep tendon reflexes were trace to absent and symmetrical; her gait and sensory examinations were normal; and, she had tenderness in some of her muscles. Dr. Spitzer concluded that Plaintiff had disrupted sleep syndrome, corrected sleep apnea, extreme daytime fatigue, and some cataplexy[31] (Tr. 622-623).

On May 15, 2009, Plaintiff had a sleep study. Neil Kline, D.O., R.P.S.G.T. reported that the study demonstrated borderline obstructive sleep apnea and suggested significant daytime sleepiness. He recommended that Plaintiff consider treatment (Tr. 620-621).

On June 4, 2009, Dr. Spitzer reviewed Plaintiff's sleep study results and found that she had cataplexy, and extraordinary daytime sleepiness that became worse as the day progressed

---

[31]Cataplexy is "a condition in which there are abrupt attacks of muscular weakness an hypotonia triggered by an emotional stimulus such as mirth, anger, fear, or surprise. It is often associated with narcolepsy." *Dorland's Illustrated Medical Dictionary*, 308 (31st Ed. 2007).

(Tr. 619). Plaintiff also had extremely disrupted sleep: she woke up frequently, and never reached the deep stages of sleep despite being extraordinarily sleepy (Tr. 617). Plaintiff told Dr. Spitzer that she was extremely clumsy, injured herself frequently for unexplained reasons, fell irregularly and unpredictably without explanation, dropped things and, had episodic periods of sudden motor weakness. Dr. Spitzer diagnosed Plaintiff with narcolepsy and cataplexy (Tr. 619).

### d.     Opinions and Diagnoses from Doctors and Examiners

On January 21, 2008, Shelley Galasso Bonanno, M.A., diagnosed Plaintiff with depressive disorder, arthritis, fibromyalgia, left ankle reconstruction, dermatitis, and chronic pain (Tr. 496). "Overall, [Plaintiff] denied requiring assistance to care for her basic needs of food, clothing, and shelter," including making short grocery shopping trips, preparing simple meals with her husband, and doing laundry and light housework (Tr. 493)

Despite Plaintiff's impairments, on January 24, 2008, Leonard C. Balunas, Ph.D., found that Plaintiff could perform unskilled work that involved one- and two-step instructions with limited need for sustained concentration (Tr. 512, 530). He found Plaintiff was mildly limited in her activities of daily living; she was also moderately limited in her ability to maintain concentration, persistence, and pace; understand, remember, and carry out detailed instructions; and, maintain attention and concentration for extended periods (Tr. 524, 528).

On February 20, 2008, Rebecca Lindsey completed a physical RFC. Ms. Lindsey found that Plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; and, stand, walk, and sit for approximately six hours in an eight-hour workday (Tr. 544). Ms. Lindsey also found that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and, occasionally balance, stoop, kneel, crouch, and crawl (Tr. 545). Plaintiff was limited to frequent handling and fingering with her right hand due to mild carpal tunnel

syndrome (Tr. 546). Finally, Ms. Lindsey found that Plaintiff should avoid even moderate exposure to hazards (Tr. 547).

### 3.   Vocational Expert

The ALJ asked a VE to assume a hypothetical individual of Plaintiff's age, education and past work experience. The individual could perform light work, but could only occasionally climb, balance, stoop, kneel, crouch, and crawl; frequently handle and finger on the right side due to mild carpal tunnel syndrome; must avoid moving machinery and unprotected heights due to daytime sleepiness; and, is limited to simple tasks with one- and two-step instructions (Tr. 24-25). The VE testified that such an individual could not perform Plaintiff's past relevant work, but could perform work as a visual inspector checker, small products assembler, or hand packager (Tr. 25). When Plaintiff's attorney added to the hypothetical that the individual would miss at least three days of work per month, the VE testified that such an individual would be precluded from work (Tr. 26).

In a second hypothetical, the ALJ asked the VE to assume an individual of Plaintiff's age, education and past work experience. The individual could lift seven pounds; sit, stand or walk for 10 minutes; and, experiences frequent loss of concentration, persistence and pace that takes her off task up to two-thirds of the time (Tr. 26). The VE testified that such an individual would be precluded from work (Tr. 26).

### D.   *Plaintiff's Claims of Error*

### 1.   Treating Source Rule

Plaintiff's first argument is that the ALJ erred in his assessment of Dr. Saluja's opinion. Specifically, Plaintiff argues that the ALJ did not provide adequate reasons for not crediting Dr.

Saluja's opinion regarding Plaintiff's ability to walk and stand, and regarding her need for unscheduled breaks or absenteeism due to her chronic fatigue and excessive sleepiness.

### a.     Dr. Manveen Saluja's Examination Notes

On November 26, 2007, Dr. Saluja noted that Plaintiff appeared tired and had difficulty walking (Tr. 403, 405).  She found Plaintiff had: (1) multiple tender points[32] of fibromyalgia; (2) mild swelling in her left ankle; (3) mild tenderness in her right ankle; (4) puffiness at the MCP joints;[33] and, (5) mild tenderness at the MTP joints (Tr. 403-404).[34]  Dr. Saluja diagnosed Plaintiff with fibromyalgia with flare up; marked obesity; and, bilateral ankle osteoarthritis.  She recommended that Plaintiff use a CPAP machine (Tr. 404).[35]  Dr. Saluja noted that Plaintiff was last seen in her office in May of 2005, and she did not have any explanation for why Plaintiff did not keep her follow up appointment (Tr. 402).  The reason for Plaintiff's visit on November 26, 2007 was "she is going on disability, [and] it has been suggested by her treating physician to come back to us – Dr. Stroud" (Tr. 402).

--------

[32]"Tender points are specific places on the body (18 specific points at [nine] bilateral locations) that are exceptionally sensitive to the touch in people with fibromyalgia upon examination by a doctor."  See http://arthritis.about.com/od/fibromyalgia/g/tenderpoints.htm (last visited July 12, 2013).

[33]"The main knuckle joint [on the finger] is the *metacarpophalangeal joint* (MCP joint). It is formed by the connection of the metacarpal bone in the palm of the hand with the finger bone, or *phalange*."  See http://www.eorthopod.com/content/pip-joint-injuires-finger (last visited July 17, 2013) (italics in original).

[34]"MTP joints, or metatarsal-phalangeal joints, are joints that connect [the] mid foot to [the] toes.  *See* http://www.brfootandankle.com/2012/08/summer-blog-series-lesser-mtp-joint-pain/ (last visited July 17, 2013).

[35]"Continuous positive airway pressure therapy (CPAP) uses a machine to help a person who has obstructive sleep apnea (OSA) breathe more easily during sleep."  *See* http://www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea (last visited July 17, 2013).

Although Dr. Saluja recommended a follow-up visit four to six weeks after the visit on November 26, 2007 (Tr. 405), Plaintiff did not return to Dr. Saluja until January 20, 2009.  At that visit, Dr. Saluja assessed Plaintiff's inflammatory arthritis and fribromyalgia and noted that Plaintiff continued to have fatigue (Tr. 678).  Dr. Saluja also noted that the medication helped Plaintiff's fibromyalgia (Tr. 678).  According to Dr. Saluja, Plaintiff had pain and stiffness and mild swelling at the small joints of her hands, knees, ankles, and feet (Tr. 678).

On February 19, 2009, Dr. Saluja found Plaintiff had multiple tender points of fibromyalgia, puffiness at the MCP joints, and difficulty touching her toes.  Dr. Saluja diagnosed Plaintiff with obesity, chronic fatigue, fibromyalgia, and insomnia (Tr. 676).  She noted that "[o]ver the course of years, we have not been able to improve [Plaintiff's] chronic fatigue.  I discussed these issues openly with [Plaintiff] and [until] the sleep hygiene improves[,] we have seen the chronic fatigue patients continue to not feel well" (Tr. 676).

On June 3, 2009, Plaintiff reported to Dr. Saluja that she could not walk two miles or participate in sports, but she only had "some" difficulty tying shoelaces; fastening buttons; getting in and out of bed; walking outdoors on flat ground; washing her body; bending down to pick up clothes from the floor; and, getting in out and of a car, bus, train, or airplane.  Plaintiff reported no difficulty lifting a full cup or glass to her mouth, or turning faucets on and off (Tr. 672).

On August 24, 2009, Dr. Saluja's physical examination results were almost entirely normal, with the exception of anxiousness (Tr. 669).

On November 3, 2009, Plaintiff had multiple tender points of fibromyalgia; tenderness at the MCP and PIP joints;[36] tenderness at the knee joint, ankles, and feet; and, difficulty making a fist. Dr. Saluja diagnosed Plaintiff with seronegative inflammatory arthritis (Tr. 661) and reported the following problems: fibromyalgia, chronic fatigue (with narcolepsy diagnosed by Dr. Spitzer), right hand carpal tunnel surgery in November of 2008, and bilateral knee pain secondary to degenerative disc disease and obesity (Tr. 659).

### b.       Dr. Manveen Saluja's Opinion

On August 24, 2009, Dr. Saluja completed an Arthritis RFC Questionnaire (Tr. 696-700). Dr. Saluja noted that she has treated Plaintiff since April 9, 2001(Tr. 696), and that Plaintiff's diagnoses included fibromyalgia and osteoarthritis (Tr. 696). Dr. Saluja concluded that Plaintiff:

(1)     constantly had pain that interfered with her ability to maintain attention and concentration;

(2)     could not perform even "low stress jobs";

(3)     could not walk any city blocks without rest or severe pain;

(4)     could sit or stand for 10 minutes at a time;

(5)     could sit, stand, or walk for a total of less than two hours in an eight-hour workday;

(6)     had to walk around every 10 minutes for 10 minutes;

(7)     needed a job that allowed her to shift positions at will from sitting, standing or walking;

(8)     had to take "many" 20 minute unscheduled breaks;

---

[36]"Each finger has three phalanges [finger bones], separated by two *interphalangeal joints* (IP joints). The one closest to the MCP joint (knuckle) is called the *proximal IP joint* (PIP joint)." *See* http://www.eorthopod.com/content/pip-joint-injuries-finger (last visited July 17, 2013) (italics in original).

(9)     needed a cane or other assistive device when she stood or walked;

(10)    could occasionally lift 10 pounds, twist, stoop, bend, and climb stairs;

(11)    could rarely crouch and climb ladders;

(12)    could grasp, turn, and twist objects with her right hand 50% of an eight-hour work day, and grasp, turn, and twist objects with her left hand 10% of an eight-hour work day;

(13)    could use her right-hand fingers for fine manipulations 50% of an eight-hour work day, and use her left-hand fingers for fine manipulations 10% of an eight-hour work day;

(14)    could use her right arm to reach (including overhead) 50% of an eight-hour work day, and use her left arm to reach (including overhead) 10% of an eight-hour work day; and,

(15)    would be absent from work more than four days per month.

(Tr. 697-700).  Dr. Saluja's opinion was based on Plaintiff's chronic fatigue; chronic back, knee, muscle, and joint pain; swelling; stiffness; reduced range of motion in her hands, feet, and knees; joint instability; reduced grip strength; impaired sleep; tenderness; muscle weakness; abnormal gait; depression; lack of concentration; lack of sleep; restless leg syndrome; and, fibromyalgia (Tr. 696-697, 700).

### c.      *Analysis of Dr. Manveen Saluja's Opinion*

The Sixth Circuit has instructed ALJs on how to assess opinions from treating sources like Dr. Saluja:

> Treating-source opinions must be given "controlling weight" if two conditions are met:  (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

-24-

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) reh'g denied (May 2, 2013).

Here, the ALJ accorded "very little weight" to Dr. Saluja's opinion:

First, Dr. Saluja states that her opinion is based upon objective signs of joint instability, reduced grip strength, impaired sleep, tenderness, swelling, muscle weakness, abnormal gait and reduced range of motion in the hands, feet, and knees, yet her own contemporaneous examination notes document only joint tenderness and swelling[.] When considering the two, the undersigned gives greater weight to the treatment records of Dr. Saluja than to her opinion statement because the treatment records were made contemporaneously for the physician's own use in caring for a patient, rather than in contemplation of a disability determination. Second, Dr. Saluja's opinion is in direct conflict with [Plaintiff's] June 3, 2009, report to Dr. Saluja that she was unable to walk two miles and participate in sports but had only some difficulty with tying shoelaces, fastening buttons, getting in and out of bed, walking outdoors on flat ground, washing her entire body, bending down to pick up clothes from the floor, and getting in and out of a car, bus, train, or airplane. Third, Dr. Saluja's opinion contrasts sharply with the other evidence of record, including the generally normal and mild objective imaging and testing. Finally, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor-patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. 46-47). Contrary to the ALJ's decision – in addition to joint tenderness and swelling – Dr. Saluja's examination notes documented impaired sleep; and, possible reduced grip strength and abnormal gait. For example, Dr. Saluja noted that Plaintiff appeared tired, she diagnosed

Plaintiff with chronic fatigue and insomnia, and recommended that Plaintiff use a CPAP machine. Further, Plaintiff had difficulty walking; puffiness and tenderness in her finger joints; and, difficulty making a fist.

This Magistrate Judge likewise finds that – contrary to the ALJ's decision – Plaintiff's report that she only had "some" difficulty tying shoelaces; fastening buttons; getting in and out of bed; walking outdoors on flat ground; washing her entire body; bending down to pick up clothes from the floor; and, getting in and out of a car, bus, train, or airplane does not conflict with Dr. Saluja's opinion that Plaintiff: (1) could not walk any city blocks without rest or severe pain; (2) could stand for 10 minutes at a time; (3) could stand or walk for a total of less than two hours in an eight-hour workday; (4) needed a job that allowed her to shift positions at will from standing or walking; (5) had to take "many" 20 minute unscheduled breaks; and, (6) would be absent from work more than four days per month.

But, the ALJ correctly concluded that Dr. Saluja's opinion contrasted with the other evidence of record regarding the walking and standing limitations. Although there is evidence that after her foot surgery on June 19, 2007, Plaintiff had swelling, pain, muscle spasms, cramps, tenderness, weakness, instability, soreness, and burning – as the ALJ stated – the objective imaging and testing were generally normal and mild. For example, on July 30, 2007, Plaintiff's foot was in reasonable alignment. On August 27, 2007, Plaintiff's ankle and foot were in excellent clinical position, and Plaintiff had excellent up and down movement. On September 24, 2007, Plaintiff had excellent motion. On October 22, 2007, Plaintiff's range of motion improved. On November 19, 2007, Plaintiff had excellent alignment of the lower extremity and excellent active motion. On October 10, 2008, Plaintiff's range of motion improved within normal limits, her ankle strength improved, she had a proper gait pattern, and "minimal" pain

and difficulty with prolonged walking and standing. On January 21, 2008, Plaintiff had good clinical position of her foot, and excellent range of motion and strength. On May 8, 2008, Plaintiff continued to have excellent range of motion and strength. And, on April 16, 2009, Plaintiff had good range of motion in her foot, ankle, and toes.

The ALJ also correctly concluded that Dr. Saluja's opinion contrasted with the other evidence of record regarding Plaintiff's need to take unscheduled breaks or absenteeism due to her chronic fatigue and excessive sleepiness. Although there is evidence that Plaintiff had chronic fatigue, excessive sleepiness, tiredness, narcolepsy, and daytime sleepiness, the evidence does not support Dr. Saluja's opinion that Plaintiff needed unscheduled breaks or would be absent more than four days per month. Indeed, the objective medical evidence shows that Plaintiff's condition only impacted her memory and concentration, and the ALJ's RFC determination accommodated this impairment by limiting Plaintiff to simple work tasks with one or two step instructions.

This Magistrate Judge finds the ALJ acted within his "zone of choice" when he determined that Dr. Saluja's opinion was not entitled to controlling weight, because it was inconsistent with the other substantial evidence in the case record. *See Cutlip*, 25 F.3d at 286; *Mullen*, 800 F.2d at 545.

This does not end the analysis:

> when "the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544. Additionally, "a decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the

-27-

adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996)).

*Beardsley v. Comm'r of Soc. Sec.*, No. 12-cv-11167, 2013 WL 1118009, at *3 (E.D. Mich. March 18, 2013). Here, the ALJ considered the frequency with which Dr. Saluja treated Plaintiff (i.e., on November 26, 2007, January 20, 2009, February 19, 2009, June 3, 2009, August 24, 2009, and November 3, 2009); the treatment she provided; the kinds and extent of examinations performed or ordered from specialists and independent laboratories (e.g., on November 3, 2009, Dr. Saluja ordered a bone scan); whether Dr. Saluja's opinion was supported by medical signs and laboratory findings; whether the opinion was consistent with the record as a whole; and, the fact that Dr. Saluja was a rheumatologist.

This portion of the ALJ's decision should not be disturbed on appeal.

### 2.     Ms. Lindsey's Opinion

Plaintiff next argues that the ALJ improperly relied on Ms. Lindsey – a non-physician – to substantiate his opinion that Plaintiff could perform a limited range of light work. Specifically, Plaintiff argues that "[o]ne of the biggest errors made by the ALJ is that in relying on the assessment of SSA agent Lindsey as the basis for his RFC conclusion, the ALJ thought he was relying on the report of a physician; he was not" (Dkt. No. 14 pgs. 14-15).

The ALJ afforded "great weight" to Ms. Lindsey's opinion that Plaintiff could perform the exertional requirements of "light" work (Tr. 47). But, Ms. Lindsey was a single decision maker whose RFC was not entitled to such weight. *See Eshelman v. Astrue*, No. 06-107, 2007 WL 2021909, at *3 (D. Me. July 11, 2007) ("the first of the two DDS assessments . . . was completed by a layperson 'Single Decision Maker.' Thus, any reliance upon it was (and is) misplaced") (internal citation omitted); *Bergschwenger v. Comm'r of Soc. Sec.*, No. 11-11752,

2012 WL 4009916, at *13 (E.D. Mich. Aug. 20, 2012) (holding that the ALJ erred in relying on the single decision maker's assessment where no medical professional subsequently affirmed the assessment); *Maynard v. Comm'r of Soc.* Sec., No. 11-12221, 2012 WL 5471868, at *9 n.3 (E.D. Mich. Sept. 11, 2012) ("findings made by SDMs are *not* opinion evidence that Administrative Law Judges (ALJs) . . . should consider and address in their decisions") (emphasis in original). As such, the ALJ mistakenly relied on Ms. Lindsey's lay opinion.

The Commissioner argues that "any error committed by the ALJ was harmless: "the ALJ[] stated that, aside from the single decision makers[sic] [RFC] assessment, 'there exist[s] a number of other reasons to reach a similar conclusion as explained throughout this decision' [and] any remand would be an idle and useless formality because the ALJ explicitly stated that the remainder of the evidence would lead to the same conclusion" (Dkt. No. 19 at pgs. 13-14 (CM/ECF) (quoting Tr. 47)).  Plaintiff says she:

> suffers from a multitude of problems including obesity, fibromyalgia, arthritis in her knees, degenerative changes in the L5-S1 area, as well as being status/post foot reconstruction.  All of these conditions impact [her] ability to stand and walk throughout a work-day.  For the ALJ to have concluded based upon his own lay-review of the radiologic findings and in rejection of the treating rheumatologist's opinion, that [she] could stand/walk for up to six hours a day, every day, he needed to have at least the imprimatur of some physician suggesting that the evidence supports such a conclusion, and he does not.

(Dkt. No. 20 at p. 4).

This Magistrate Judge agrees with Plaintiff.  ALJ RFC determinations must be supported by medical opinions.  As Judge Walter H. Rice of the Southern District of Ohio recently wrote:

> This Court has stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data.  Moreover, this Court has found that an ALJ is not qualified to translate raw medical data, such as MRIs, into functional capacity determinations.

*Mitsoff v. Comm'r of Soc. Sec.*, No. 3:12cv046, 2013 WL 1098188, at *8 (S.D.Ohio March 15,

2013) (internal citations omitted); *see also Sparck v. Comm'r of Soc. Sec.*, No. 11-10521, 2012

WL 4009650, at *9 (E.D. Mich. Aug. 23, 212) (while the ALJ reserves the right to decide a

claimant's RFC, he must rely on medical opinions to support his conclusions regarding a

claimant's mental and cognitive limitations); *Rohrberg v. Apfel*, 26 F.Supp.2d 303, 311 (D. Mass

1998):

> An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical
> findings, and as a result an ALJ's determination of RFC without a medical
> advisor's assessment is not supported by substantial evidence. *See Rodriguez v.
> Sec'y of HHS*, 893 F.2d 401, 403 (1st Cir. 1989). Where the "medical findings in
> the record merely diagnose [the] claimant's exertional impairments and do not
> relate these diagnoses to specific residual functional capabilities such as those set
> out in 20 C.F.R. § 404.1567(a) . . . [the Commissioner may not] make that
> connection himself." *Rosado v. Sec'y of HHS*, 807 F.2d 292, 292 (1st Cir. 1986).

ALJs can make their own functional capacity determinations from the medical evidence when a

claimant has little physical impairment. *See Mitsoff*, 2013 WL 1098188, at *9:

> The Court recognizes there are limited occasions when the medical evidence is so
> clear, and so undisputed, that an ALJ would be justified in drawing functional
> capacity conclusions from such evidence without the assistance of a medical
> source. *See Deskin*, 605 F.Supp.2d at 912 ("To be sure, where the medical
> evidence shows relatively little physical impairment, an ALJ permissibly can
> render a commonsense judgment about functional capacity even without a
> physician's assessment").

This is not a case where the ALJ could make his own RFC determination based on the raw

medical evidence. As explained above, the ALJ properly discounted Dr. Saluja's opinion, and

improperly relied on Ms. Lindsey's opinion. As such, there was no medical opinion to support

the ALJ's RFC determination. The ALJ impermissibly relied on his own interpretation of the

medical data of record; therefore, the ALJ's RFC determination is unsupported by substantial

evidence.  This case should be remanded for a redetermination of Plaintiff's RFC.[37]

## IV.   CONCLUSION

Because the ALJ's RFC determination is not supported by substantial evidence, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, the Commissioner's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *See McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this Magistrate Judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  *See* E.D. Mich. LR 72.1(d)(3), (4).

<div style="margin-left:40%">

s/Mark A. Randon_____

Mark A. Randon

</div>

---

[37]Because this Magistrate Judge recommends remand based on a flawed RFC determination – and an appropriate RFC determination could lead to the conclusion that Plaintiff is disabled – Plaintiff's additional arguments need not be addressed.

United States Magistrate Judge

Dated:  July 24, 2013

### *Certificate of Service*

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, July 24, 2013, by electronic and/or ordinary mail.

*s/Eddrey Butts*
*Case Manager for Magistrate Judge Mark A. Randon*